## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

K & J COAL CO., INC,                    )
    Appellant/Cross Appellee,       )       CIVIL ACTION NO. 3:05-298
                                    )       (Consolidated with C.A. No. 3:05-299)
v.                                      )
                                    )
PPL GENERATION, LLC,                    )       JUDGE KIM R. GIBSON
    Appellee/Cross Appellant.       )

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on cross-appeals from the May 24, 2005, Memorandum

Opinion and Order of the United States Bankruptcy Court for the Western District of Pennsylvania. For

the following reasons, the decision of the Bankruptcy Court will be affirmed in part and vacated in part,

and the case will be remanded for further proceedings consistent with this Opinion.

## I. INTRODUCTION

The Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a). "The Bankruptcy

Court's factual findings may not be set aside unless they are clearly erroneous." *Kool, Mann, Coffee

& Co. v. Coffey*, 300 F.3d 340, 353 (3d Cir. 2002). This Court must "accept the ultimate factual

determination of the fact-finder unless that determination either is completely devoid of minimum

evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive

evidentiary data." *Id.* at 353 (quoting *Hoots v. Pennsylvania*, 703 F.2d 722, 725 (3d Cir. 1983) (citation

omitted)). In reviewing the Bankruptcy Court's factual findings, this Court must "give due regard to

the opportunity of that court to judge first-hand the credibility of witnesses." *Fellheimer, Eichen &*

1

*Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995).  The legal determinations made by the Bankruptcy Court are subject to plenary review.  *Kool, Mann, Coffee & Co.*, 300 F.3d at 353.

## II. BACKGROUND

### A.    The Relevant Contracts

K & J Coal Company, Inc. (hereinafter "K&J") is in the business of mining and selling bituminous coal from a mine located in Westover, Pennsylvania.  Document No. 1-9, p. 2.  PPL Generation, LLC (hereinafter "PPL") purchases coal for power plants that generate electricity, including one near Pittsburgh, Pennsylvania, known as the Montour facility.  *Id.*  In order to supply coal for the Montour facility, PPL has long-term contracts with various coal suppliers, including K&J.  *Id.*

On March 12, 2001, K&J and PPL executed a coal purchase agreement that was retroactive to January 1, 2001, and effective until December 31, 2004 (hereinafter "the Agreement").  *Id.*  Article 3 of the Agreement obligated K&J to sell approximately 10,000 tons of coal per month to PPL, creating an arrangement for the sale of between 115,000 and 125,000 tons of coal per year.  *Id.*  Article 4 required PPL to inform K&J by the twentieth day of each month how much coal it would need for the following month, and the exact date of delivery was to be determined by mutual agreement of the parties.  *Id.*  In Article 4(A), K&J warranted that its coal would meet certain criteria, including a requirement that the coal contain a minimum of 12,500 British Thermal Units (hereinafter "BTU") per pound and a monthly sulfur content averaging 0.9 pounds per million BTUs.  *Id.* at 3.  The per-ton purchase price of the coal was $25.49 in 2001, $25.99 in 2002, $26.49 in 2003, and $26.74 in 2004.  *Id.*  Under Article 8(A), the coal was to be loaded into train hoppers at K&J's mine in Westover, at a

2

site known as Dawn Tipple. The coal was then transported by railroad to the Montour facility. *Id.*

According to Article 13(A), K&J would be in default of the Agreement if it failed to perform any of the covenants or conditions for a period of thirty days after receiving written notice from PPL. *Id.* In that event, Article 13(C) permitted PPL to terminate the Agreement by providing K&J with the proper written notice. *Id.* Upon termination, PPL was entitled to recover excess cover costs under 13 PA. C.S. § 2712, as well as any incidental or consequential damages, pursuant to 13 PA. C.S. § 2715. *Id.* Article 23 expressly provided that the rights and obligations of the parties were to be governed by the law of the Commonwealth of Pennsylvania. *Id.* Under Article 25, neither party was permitted to assign its rights or obligations arising under the Agreement to a third party unless the other party acknowledged its consent to the assignment in writing. *Id.* An exception to this general prohibition, however, permitted PPL to assign all or part of the Agreement to any of its affiliates without K&J's consent. *Id.*

While the Parties were negotiating the Agreement, PPL was undergoing an internal reorganization. *Id.* at 4. Two subsidiaries, PPL Coal Supply and PPL Montour, were created. *Id.* Under the arrangement, PPL Coal Supply was to purchase coal from external suppliers and PPL Montour was to operate the Montour plant. *Id.* PPL also entered into an agreement with AIG Financial Products Corporation (hereinafter "AIG"), under which the latter created an entity known as Iris Energy, which, in turn, leased land at the Montour site and erected there a synfuel processing plant. *Id.* Synfuel is a liquid, gaseous or solid synthetic fuel produced by subjecting coal or other hydrocarbons to various treatments, creating a substance with a different chemical composition than that from which it is derived. *Id.* Iris Energy agreed to pay PPL Montour a royalty of $3.50 per ton for synfuel that Iris

3

Energy processed and sold to other entities, in addition to payments for rent and property taxes. *Id.* Iris Energy and PPL Montour also entered into a synfuel purchase agreement, under which PPL Montour would purchase synfuel from Iris Energy at market price less $3.31 per ton for the first 1,500,000 tons purchased in a given year and at market price less $3.81 per ton for all additional synfuel purchased in that same year. *Id.* Additionally, Iris Energy agreed with PPL Coal Supply that the latter would sell Iris Energy its entire coal requirement, thereby facilitating the operation of the synfuel plant. *Id.* Although these agreements were in effect when K&J and PPL negotiated the coal supply agreement of March 12, 2001, K&J was unaware of them. *Id.*

**B.    The § 29 Credit**

As a result of the energy crisis of the 1970s, Congress enacted tax incentives to encourage the production of fuel from nonconventional sources. Mona Hymel, *The United States' Experience with Energy-Based Tax Incentives: The Evidence Supporting Tax Incentives for Renewable Energy*, 38 LOY. U. CHI. L.J. 43, 49-50 (Fall 2006). Among these incentives was the former 26 U.S.C. § 29, which provided producers of synfuel with a tax credit worth about $27.00 per ton of synfuel produced.[1] Document No. 1-9, pp. 4-5. The tax credit could only be taken once for a given ton of synfuel. Charles D. Patterson III, *Environmental Taxes and Subsidies: What is the Appropriate Fiscal Policy for Dealing with Modern Environmental Problems*, 24 WM. & MARY L. & POL'Y REV. 121, 149-51 (2000). Consequently, if K&J were to take the synfuel tax credit, Iris Energy could not take the tax credit for the same synfuel, even if it further processed the synfuel. Document No. 1-9, p. 5.

---

[1] The former 26 U.S.C. § 29 is now codified as 26 U.S.C. § 45K.

4

In 1978, K&J started to process the coal that it mined at Westover and sold to customers such as PPL. *Id.* In so doing, K&J added liquid hydrocarbons to the coal in order to bind the coal "fines," which would otherwise be lost during the processing. *Id.* This not only increased the recovery rate of the coal that K&J mined, but also increased the coal's BTU output. *Id.* Prior to March 2001, K&J considered seeking a private letter ruling (hereinafter "PLR") from the Internal Revenue Service (hereinafter "IRS") establishing that this process qualified for the § 29 credit. *Id.* Nevertheless, K&J opted against pursuing the PLR, apparently because of the cost of hiring the consultants necessary for demonstrating the presence of the statutory criteria. *Id.* Given the nature of the complex technological issues involved, a determination as to whether an entity was entitled to a § 29 tax credit was quite complicated. *True Oil Co. v. Comm'r of Internal Revenue*, 170 F.3d 1294, 1297-305 (10th Cir. 1999).

## C.   The Dispute Arises

On May 21, 2001, only nine weeks after the execution of the Agreement, Michael Snovitch (hereinafter "Snovitch") of PPL sent a letter to K&J President Dale Augenstein (hereinafter "Augenstein") indicating that PPL's rights under the Agreement would be assigned to PPL Coal Supply on June 1, 2001. Document No. 8, pp. 50-51. Snovitch also requested an amendment to the Agreement that would require all shipments of coal that K&J delivered to consist entirely of coal, unless PPL provided advance written consent to the shipment of synfuel. *Id.* In order to explain the rationale for the proposed amendment, the letter stated:

> As you are aware, synfuel has become a coal substitute in many instances and is available at many times in the marketplace competing with coal. Accordingly, it is important for PPL Generation to differentiate clearly between shipments of coal and synfuel, for reasons related to safety, handling and permit issues. As a result, PPL Generation proposes to amend the Coal Purchase Agreement to specify that only coal

5

will be shipped and delivered under the Coal Purchase Agreement.

*Id.* at 50. As the Bankruptcy Court saw it, "[t]he obvious purpose of the proposed amendment was to preserve the ability of Iris Energy to avail itself of the [§ 29] synfuel tax credit and to pass a portion of that credit on to [PPL] Montour in the form of a reduction in the price of the synfuel [that] it purchased from Iris Energy." Document No. 1-9, p. 5. K&J did not agree to the proposed amendment. *Id.*

On July 26, 2001, a telephone conference was held between Augenstein, K&J Vice-President Richard Thornhill (hereinafter "Thornhill"), PPL Coal Supply Manager Ben Stothart (hereinafter "Stothart"), and PPL employee Jim Maas (hereinafter "Maas"). *Id.* at 6; Document No. 2, p. 16. Apparently, they discussed the question of whether the Agreement, even without the proposed amendment, permitted K&J to ship synfuel rather than coal. Document No. 1-9, p. 6. Thereafter, Stothart sent Augenstein a letter dated July 27, 2001, which stated, in pertinent part, as follows:

As I stated on the telephone, the Agreement already prohibits K&J from shipping any product other than coal. It is, after all, a Coal Purchase Agreement. PPL believes that signing the letter amendment, as we request, will clarify this fundamental point and will allow for future shipment of synthetic fuels if PPL consents in writing. We are not looking to take away the future possibility that K&J may want to purchase synfuel from market sources and use as a blend stock to ship with its coal, nor the future possibility that K&J may produce synfuel to ship, in whole or in part, with its coal, as long as we can reasonably accommodate it. Nonetheless, for operating, safety, and planning purposes, we need to know when such shipments of synfuel are coming and be able to identify them.

Accordingly, whether K&J executes the requested Amendment #1 or not, PPL is entitled to notice, and K&J must obtain PPL's permission, if and when synfuel is included in any shipment. As a result, and in adherence with the terms and conditions of the Agreement, PPL expects that all contract shipments from K&J will consist solely of coal. No synfuel is to be included in any shipments to PPL without the prior written consent of either Jim Maas or myself.

Document No. 8, pp. 52-53. In a letter dated July 31, 2001, Augenstein responded by stating that K&J

6

did not agree with PPL's interpretation of the Agreement. *Id.* at 54. Augenstein's letter also made it clear that if K&J's processing of coal (consistent with PPL's specifications) enabled it to qualify for a § 29 credit, then K&J intended to pursue it. *Id.* Finally, Augenstein indicated that K&J had no way of knowing whether PPL Coal Supply was an affiliate of PPL and, therefore, no way of knowing whether K&J's consent was necessary to effectuate the assignment. *Id.*

Stothart sent Augenstein a letter dated August 3, 2001, in which he acknowledged that K&J could use a "cleaning process" to ensure that the coal met PPL's specifications. *Id.* at 55. Nevertheless, Stothart also stated that if K&J began to employ a process which produced synfuel, it could not include that synfuel in subsequent shipments to PPL absent prior written authorization from PPL. *Id.* Augenstein responded with a letter dated August 10, 2001, in which he expressed the view that the Agreement permitted K&J to ship coal which met both PPL's specifications and the criteria for a § 29 tax credit. *Id.* at 56.

The Parties then conducted a meeting on August 22, 2001, where they continued to disagree as to whether the Agreement permitted K&J to ship synfuel to PPL. Document No. 1-9, p. 6. Although K&J indicated a willingness to agree to the proposed amendment if PPL shared with it the benefit conferred on PPL Montour in the form of Iris Energy's reduced rates, PPL refused to consider such a proposal. *Id.* Despite the Parties' failure to agree, PPL continued to accept deliveries from K&J. *Id.* Nevertheless, PPL segregated deliveries from K&J when they arrived at the Montour facility by placing them on the opposite side of the railroad track from the coal deliveries of other suppliers. *Id.* at 6-7. According to the Bankruptcy Court, "[t]his was meant to [en]sure that what [K & J] delivered would not pass through Iris Energy's facility and prevent Iris Energy from availing itself of the [§ 29] tax

7

credit." *Id.* at 7. As a result, Iris Energy was able to pass a portion of the tax credit on to PPL Montour via a price reduction. *Id.*

On January 17, 2002, Thornhill sent Stothart a written proposal to amend the Agreement by increasing the volume of shipments to 230,000 tons in 2002 and 240,000 tons for both 2003 and 2004 in return for a price increase in the price per ton delivered during those years. Document No. 8, p. 57. Thornhill further stated that while K&J was still pursuing § 29 qualification for its synfuel process, it was willing to agree that shipments made pursuant to the new proposal would not contain coal that qualified for the § 29 tax credit. *Id.* PPL did not respond to this proposal. Document No. 1-9, p. 7.

## D.     K&J's Default and Bankruptcy

In May 2002, after making its delivery for that month, K&J ceased mining operations at the Westover site. *Id.* Although K&J laid off its hourly employees, its salaried employees remained on the payroll. *Id.* On May 28, 2002, K&J informed PPL that its operations at the Westover mine had ceased. *Id.* After informing PPL that it was seeking a buyer for its assets, K&J proposed a plan to ship coal from sites other than Dawn Tipple. *Id.* Article 8 of the Agreement provided that K&J could not ship coal from other sites to PPL without the latter's explicit consent. *Id.* PPL rejected K&J's proposal. *Id.* The next delivery due under the agreement was scheduled for June 17, 2002. *Id.* at 8. Nevertheless, on June 14, 2002, K&J advised PPL that further performance would not occur. *Id.* K&J made no further deliveries during the remaining term of the Agreement. *Id.*

PPL Coal Supply sent a letter to Thornhill dated June 20, 2002. Document No. 8, p. 58. The letter indicated that the failure of K&J to perform within thirty days would constitute a default under the agreement, and that PPL Coal Supply reserved the right to pursue any applicable legal and equitable

8

actions. *Id.* By that time, K&J had already filed a voluntary Chapter 11 petition on June 19, 2002. Document No. 1-9, p. 8. February 20, 2003, was designated as the deadline for the filing of a proof of claim in the case. *Id.* PPL had actual notice, though not formal notice, of the bankruptcy filing. *Id.*

In letters to K&J dated September 17, 2002, and November 18, 2002, PPL inquired as to whether K&J intended to reject the Agreement. *Id.* K&J never responded to these inquiries. *Id.* PPL's counsel sent a third letter on October 27, 2003, after the passage of the claims bar date. *Id.* at 9. Noting that K&J's proposed disclosure statement and plan did not mention the Agreement, this letter asserted that the claims bar date did not apply to executory contracts which had not been rejected. *Id.* Indicating that PPL was preparing to file a proof of claim for rejection damages, the letter also asked K&J to bring a motion to reject the agreement and to effect the relevant modifications to its disclosure statement and plan. *Id.* K&J did not respond to this letter. *Id.*

On December 9, 2003, K&J submitted an amended disclosure statement and liquidating Chapter 11 plan. *Id.* Class 12 of the amended plan included all creditors with allowed general unsecured claims. *Id.* Class 13 included only Seaboard Surety and Nova Chemicals, both of which also had allowed general unsecured claims. *Id.* After payment of the claims to the members of Classes 1-11, Seaboard Surety and Nova Chemicals were to be paid $800,000.00. *Id.* Liquidation proceeds were then supposed to be paid, without interest, to the claimants in Class 12. *Id.* Seaboard Surety and Nova Chemicals were slated to receive an additional $300,000.00 upon full payment of all allowed Class 12 claims. *Id.* The amended plan also provided that all executory contracts were deemed to be assumed at the time of plan confirmation, except to the extent that any executory contract to which K&J was a party was rejected prior to confirmation or a motion to reject it was pending at the time of confirmation

9

and ultimately approved. *Id.*

On January 29, 2003, PPL filed Proof of Claim No. 54, seeking rejection damages in the amount of $1,476,526.71.[2] *Id.* By that time, more than eleven months had elapsed since the claims bar date. *Id.* The next day, PPL objected to K&J's amended Chapter 11 plan on the ground that it appeared to provide for the assumption of the Agreement without adequately providing for cure under 11 U.S.C. § 365. *Id.* at 10. On February 6, 2003, K&J and PPL filed a consent motion stipulating that the Agreement would not be assumed in K&J's proposed amended plan. *Id.* Issues regarding rejection, timing, and termination were to be deferred to a later time, at which point they would be addressed in a separate objection to the claim filed by K&J. *Id.* Consequently, PPL withdrew its objection to K&J's amended plan. *Id.* The consent motion was approved by order of court on February 9, 2004, and K&J's amended Chapter 11 plan was confirmed immediately thereafter. *Id.*

K&J subsequently objected to PPL's proof of claim on four grounds, contending that: (1) by refusing to accept coal from sites other than Dawn Tipple, PPL terminated the Agreement before K&J filed its Chapter 11 petition and, therefore, had no claim against the bankruptcy estate; (2) PPL's failure to accept coal from sites other than Dawn Tipple constituted a failure to mitigate damages; (3) PPL's claim was time-barred because of the passage of the deadline for filing a proof of claim; and (4) PPL suffered no economic loss as a consequence of K&J's failure to perform and, therefore, was not entitled to recover damages. *Id.* at 1.

## E.     The Bankruptcy Decision and the Present Appeal

---

[2] PPL also filed Proof of Claim No. 55, which sought rejection damages in the amount of $1,476.526.71. Document No. 1-9, p. 10. The Bankruptcy Court was unable to determine the reason for the filing of Claim No. 55, which appeared to be identical to Claim No. 54 in all relevant respects. *Id.* at n.1.

The Bankruptcy Court disposed of K&J's objections in a decision dated May 24, 2005. With respect to the first issue, the Bankruptcy Court rejected K&J's argument that PPL had terminated the Agreement prior to the filing of the Chapter 11 petition. *Id.* at 11. Article 8 expressly provided that the coal K&J supplied to PPL was to come from Dawn Tipple unless the parties agreed otherwise. *Id.* at 11-13. Reasoning that PPL was under no obligation to "agree otherwise," the Bankruptcy Court concluded that PPL's refusal to accept coal from alternative sources did not constitute a termination of the Agreement, even though that refusal made K&J's performance virtually impossible. *Id.* The Bankruptcy Court also determined that PPL's communications to K&J demanding performance were inconsistent with the idea that PPL had terminated the agreement. *Id.* at 12. For similar reasons, it was determined that PPL's refusal to accept coal from alternative sources did not constitute a failure to mitigate damages. *Id.* at 13-15. The Bankruptcy Court reasoned that PPL's refusal was justified by K&J's tenuous financial status and inability to identify specific locations from which coal could be extracted in compliance with PPL's specifications. *Id.* Moreover, the Bankruptcy Court determined that since K&J's conduct constituted a rejection of the Agreement, PPL's claim could be filed pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3) notwithstanding the passage of the filing deadline. *Id.* at 15-19.

Moving on to the fourth issue, the Bankruptcy Court concluded that PPL was entitled to damages in the amount of $1,232,391.44. *Id.* at 31. The cross-appeals *sub judice* challenge the Bankruptcy Court's calculation of these damages. Given the limited nature of the inquiry, the Court has no occasion to consider the substantive issues underlying the Bankruptcy Court's decision, nor need it interpret the Agreement. At this juncture, the parties do not dispute that PPL never terminated the

Agreement; that PPL's refusal to accept coal from sites other than Dawn Tipple did not constitute a

failure to mitigate damages; or that PPL's claim was permissibly filed under FED. R. BANKR. P.

3003(c)(3). Additionally, there is no question that K & J breached the Agreement. K&J only argues

that PPL suffered no damages as a result of that breach. Document No. 2, pp. 25-39. In contrast, PPL

argues that the Bankruptcy Court correctly awarded it damages, but that the calculation was not in

conformity with Pennsylvania law. Document No. 5, pp. 12-27.

## III. ANALYSIS

At the outset, the Court notes that Pennsylvania has adopted the Uniform Commercial Code,

the pertinent portions of which provide as follows:

> **§ 2712. "Cover"; procurement by buyer of substitute goods**
> **(a) Right and manner of cover.**—After a breach within section 2711 (relating
> to remedies of buyer in general; security interest of buyer in rejected goods) the
> buyer may "cover" by making in good faith and without reasonable delay any
> reasonable purchase of or contract to purchase goods in substitution for those
> due from the seller.
> **(b) Damages recoverable.**—The buyer may recover from the seller as damages
> the difference between the cost of cover and the contract price, together with any
> incidental or consequential damages as defined in section 2715 (relating to
> incidental and consequential damages of buyer) but less expenses saved in
> consequence of the breach by the seller.
> **(c) Other remedies unaffected by failure to cover.**—Failure of the buyer to
> effect cover within this section does not bar him from any other remedy.

> **§ 2713. Damages of buyer for nondelivery or repudiation**
> **(a) Damages recoverable.**—Subject to the provisions of this division with
> respect to proof of market price (section 2723), the measure of damages for
> nondelivery or repudiation by the seller is the difference between the market
> price at the time when the buyer learned of the breach and the contract price,
> together with any incidental and consequential damages provided in this
> division (section 2715), but less expenses saved in consequence of the breach
> by the seller.
> **(b) Determination of market price.**—Market price is to be determined as of

12

the place for tender, or in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

### § 2715. Incidental and consequential damages of buyer

**(a) Incidental damages.**—Incidental damages resulting from the breach of the seller include:

    (1) expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected;

    (2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and

    (3) any other reasonable expense incident to the delay or other breach.

**(b) Consequential damages.**—Consequential damages resulting from the breach of the seller include:

    (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

    (2) injury to person or property proximately resulting from any breach of warranty.

13 PA. C.S. §§ 2712-2713, 2715.

Relying on §§ 2712(b) and 2713(a), K&J first argues that its breach saved PPL certain expenses, which the Bankruptcy Court should have deducted from any award of damages. Document No. 2, pp. 25-26. First, K&J contends that because PPL was uncertain whether or not the coal that K&J supplied under the Agreement was synfuel, PPL paid at least $2.00 per ton segregating K&J's coal from that delivered by other suppliers, which was known not to contain synfuel. Document No. 2, pp. 27-30. Since K&J's breach of the Agreement forced PPL to cover with replacement coal known not to contain synfuel, eliminating the need for segregation, K&J argues that the Bankruptcy Court erred in not deducting the $2.00 per ton special handling fee from the damages award. *Id.* Second, K&J asserts that the coal used in place of its coal likely qualified for the § 29 tax credit, thereby enabling PPL to take advantage of the "synfuel discount." *Id.* at 31-34.

13

In its cross-appeal, PPL contends that the Bankruptcy Court erred in calculating the amount of "incidental damages" under 13 PA. C.S. §§ 2712 and 2713. Document No. 5, pp. 20-26. According to § 2715(a)(2), incidental damages include "any commercially reasonable charges, expenses or commissions in connection with effecting cover." Because the term "incidental . . . damages" is included in §§ 2712 and 2713, PPL argues that the Bankruptcy Court erred in utilizing the lowest price of the coal contracts to calculate both the cover price under § 2712 and the market price under § 2713. *Id.* at 22. According to PPL, the Bankruptcy Court applied the wrong legal standard.

The Court will address each of the Parties' arguments in turn.

## A. K&J's Appeal

### 1. The Special Handling Fee

K&J first argues that PPL, by choosing to segregate the K&J coal from other coal, incurred charges of at least $2.00 per ton. Document No. 2, pp. 25-33. Both Thornhill and Augenstein testified that PPL personnel had indicated that it was costing that company "a couple bucks a ton" to specially handle the coal from K&J. Document No. 7, pp. 61-62, 79. K&J cites Stothart's testimony for affirmation of this figure. Document No. 2, p. 28.

Stothart did not state that PPL was spending $2.00 per ton to specially handle K&J coal, however, but was speaking in general terms about the aggravation of dealing with K&J.

[Counsel]: Do you recall discussing, with Rick, that one of the reasons that you wanted the amendment signed was that it was costing PPL money to special handle K&J's product, and it was at least a couple of bucks a ton?

[Stothart]: I don't recall what was specifically said at that meeting. I don't doubt that we were trying to emphasize that the—that their product was causing us a pain in the neck. And we were trying to put our best light on it. I don't remember saying a couple

14

of bucks a ton is what it was costing us. I would not—I would imagine that it was costing us money, yes.

[Counsel]: And would that money be a couple of bucks a ton?

[Stothart]: I have no idea.

Document No. 7, pp. 22-23. Other evidence on record indicates that segregating K&J coal did not require additional labor or equipment. Document No. 5-2, pp. 12-13. Moreover, evidence that segregating fuels in the Montour facility was an ordinary requirement suggests there was nothing particularly special in how PPL handled K&J coal. Document No. 7, p. 23 (quoting Stothart's testimony that PPL usually specially handled any synfuel that was sent to Montour). The Bankruptcy Court thus validly concluded, as a factual matter, that

> [w]e are not persuaded that it cost PPL anything more to unload and store the product [K&J] supplied than what it would cost for replacement coal. Segregating what [K&J] supplied merely consisted of piling it on the opposite side of the railroad track from where it stored ordinary coal. No special equipment or labor was required to unload and store or to retrieve what debtor had supplied.

Document No. 1-9, p. 29.

Under Pennsylvania law, overhead fixed costs are not properly deductible for purposes of calculating damages in a case such as this. *Jessup & Moore Paper Co. v. Bryant Paper Co.*, 147 A. 519, 524 (Pa. 1929) ("The overhead expenses, which defendant insists should be added as a cost of manufacture, were constant in character, and would not have been affected by the performance of the additional work."). PPL contends that because segregating K&J coal required neither additional labor nor additional equipment, any cost it incurred to specially handle that coal was part of its fixed costs. Document No. 5, p. 18. The Bankruptcy Court's identical factual conclusion finds adequate support

in the evidentiary record to be unassailable as a matter of law. Accordingly, the Court will affirm the

decision that the damages must not be reduced by the amount it would have cost to segregate any

replacement coal.

**2.      The § 29 Credit**

K&J argues that PPL treated its coal as synfuel, thereby foregoing the § 29 credit it subsequently

enjoyed with replacement coal. Document No. 2, pp. 31-34. In support, K&J cites to Augenstein's

testimony that because more than half of the coal burned at Montour was processed through Iris Energy,

it is more likely than not that the replacement coal received the synfuel discount that Iris passed to PPL

Montour. *Id.*

[Augenstein]: Okay. Looking at Exhibit 122 I said, assume that on the average 63 percent of the total coal burned by Montour goes through the Iris synfuel plant, and assuming that the average discount on the Iris tonnage during the year is 3.51 a ton, it's somewhere between 3.31 and 3.81, for '03 it worked out to be 3.51 per ton, using that, multiplying that times the percentage of coal that actually went through Iris relative to the total Montour burn, you get an average benefit per ton of Montour burn of $2.21 a ton. Okay? So if the average per ton of coal burned at Montour is 2.21 per ton discount, looking at my prior damage calculation that I'd done earlier in the evening--

[Counsel]: That would be Exhibit 121 that has the most recent EAs on it?

[Augenstein]: Right. We're considering a total of 290,000 tons, 10,000 tons per month, 29,000 tons—29 months of damage—of coal replacement, the $2.21 a ton is $1.30 less than the average Iris discount I used on this last damage calculation.

[Counsel]: So that—

[Augenstein]: The average—I will—I will tell you that the calculated average of the Iris discount is $3.51 per ton per month on average, subtracting 2.21 from that, again on average, comes up with a figure of $1.30 decrease in the Iris discount I used on this table. That times to 290,000 tons, the replacement coal during the period, would reduce the benefit to PPL by a total of $377,000, or the remaining net benefit would be $46,700. It's the 423,700 figure in my damage table minus the 377,000 discount for the

16

fact that not all the tons burned by Montour go through Iris.

[Counsel]: So under your analysis it's K&J's position that when we—when K&J stopped delivering coal that because the replacement coal would qualify to go through the Iris energy plant and would not have to be specially handled that the end bottom line is that PPL ended up saving $46,700?

[Augenstein]: That's correct. The K&J contract coal could not share in the Iris benefit in any way, shape or form.

Document No. 7, pp. 91-94.

According to PPL, K&J must show both that it delivered synfuel and that PPL could have obtained additional tax credits through the replacement coal that would not have been unavailable but for K&J's breach. Document No. 5, p. 14. PPL thus argues that the following facts foreclose K&J's argument that breach of the Agreement actually saved PPL money by increasing the amount of its § 29 tax credit: (1) K&J coal was not synfuel; (2) PPL did not treat the K&J coal as synfuel; (3) PPL received no synfuel benefit from the K&J coal; (4) PPL did not lose any synfuel benefit by not processing the K&J coal through Iris Energy; (5) the Iris Energy plant was operating at maximum capacity without the use of K&J coal; (6) the overall § 29 benefits PPL enjoyed after K&J's breach of the Agreement was no greater than what it enjoyed prior to the breach; and (7) PPL's contract with Iris Energy did not reduce the damages sustained as a result of K&J's breach. Document No. 5, p. 17.

The Bankruptcy Court held that K&J was required to show that it delivered synfuel before that company could be credited with any additional savings PPL enjoyed from the reduced price of replacement coal processed through Iris Energy. K&J's argument failed below because it "relie[d] on the premise that what [K&J] provided to PPL was synfuel and that Iris Energy therefore would not have been eligible to take the tax credit for processing it and could not have passed a portion of it on to

Montour by way of a price reduction." Document No. 1-9, p. 28. The Bankruptcy Court thus ended its analysis with the conclusion that "[w]hat [K&J] took out of the ground unquestionably was coal, not synfuel." *Id.* However, the Bankruptcy Court also found that PPL did in fact treat K&J coal as if it were synfuel: "PPL acted reasonably in segregating what debtor supplied because [K&J] repeatedly insisted that it was synfuel and threatened to claim the synfuel tax credit for itself." *Id.* at 30. Contrary to PPL's insistence, the Bankruptcy Court never addressed whether Iris Energy was operating at maximum capacity or whether PPL was able to reap the benefit of a § 29 price reduction on replacement coal.

Therefore, there are two central issues on appeal: 1) whether K&J must prove that it delivered synfuel or whether it suffices that PPL treated K&J's coal as if it were synfuel; and 2) whether PPL could benefit from any tax credit that Iris Energy derived from replacement coal. The Court is mindful that it does not act as a finder of fact in the context of appeals under 28 U.S.C. § 158(a), and is generally not authorized to make independent factual findings. *See In re Headquarters Dodge*, 13 F.3d 674, 679 (3d Cir. 1995) ("'The district court does not sit as a finder of facts in evaluating'" the Bankruptcy Court's conclusions (quoting *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981))); *see also Skulnik v. Skulnik*, No. 05-5783, 2007 U.S. Dist. LEXIS 22845, at **9-11 (D.N.J. Mar. 28, 2007) (following the rationale of the Tenth and Eighth Circuits in concluding that district courts "may not make its own findings of fact regardless of the information contained in the record"). "If the bankruptcy court's ruling is silent regarding material factual questions, the proper course is for the district court to remand for the necessary determinations." *In re Hinchliffe*, No. 92-4679, 1994 U.S. Dist. LEXIS 1336, **4-5 (E.D. Pa. Jan. 12, 1994) (citing *In Re Sublett*, 895 F.2d 1381 (11th Cir. 1990)).

As a matter of law, K&J need not show that it delivered to PPL synfuel from which Iris Energy could not derive any § 29 tax benefits. PPL admits that it never received any synfuel benefits from K&J coal. Document No. 5, p. 17. This Court need not consider the Bankruptcy Judge's conclusion that K&J "unquestionably" delivered coal and not synfuel because the material issue is whether the purchase of replacement coal somehow mitigated the actual losses that K&J's breach imposed on PPL. That PPL reasonably segregated K&J deliveries on the chance that they contained synfuel is therefore enough to establish the possibility that the Agreement's termination made PPL eligible for a certain pricing benefit it otherwise would not have received. If PPL was certain that Iris Energy could take the § 29 tax credit from the replacement coal purchased to cover K&J's breach, then PPL may have derived some benefit that mitigated its actual losses. The cost of PPL's cover should thus be reduced by the amount of any benefit it received from the replacement coal that it would not have garnered from K&J's coal. 13 PA. C.S.A. § 2712(b) ("The buyer may recover from the seller as damages the difference between cost of cover and the contract price. . . .").

However, K&J is not entitled to a reduction of damages based on hypothetical tax credits. Thus, if the evidence demonstrates that PPL could not enjoy any benefits from the replacement coal because Iris Energy was already operating at maximum capacity, then the damages need not be reduced. Because the Bankruptcy Court made no findings in this regard, the issue must be remanded for proper consideration from the court of first instance. On remand, it will be K&J's burden to establish that PPL did in fact enjoy some pricing benefit pursuant to the tax credits that Iris Energy accrued through the use of replacement coal. *Cf. Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294 (3d Cir. 2002) ("'[T]he party who has breached the contract or caused the loss has the burden of showing the

19

losses could have been avoided through the reasonable efforts of the damaged party.'" (quoting

*State Pub. Sch. Bldg. Auth. v. W. M. Anderson, Co.*, 410 A.2d 1329, 1331 (Pa. Commw. Ct. 1980))).

## B.    PPL's Cross Appeal

PPL cross appeals the Bankruptcy Court's calculation of damages, arguing first that the

Bankruptcy Court improperly used the lowest contract price instead of the commercial reasonableness

standard when it calculated both the cover price under § 2712 and the market price under § 2713.

Document No. 5, pp. 16-22.  Second, PPL asserts that the Bankruptcy Court erred by reducing PPL's

damages for the months of June and July 2002.  *Id.* at 22.

### 1.    Commercial Reasonableness

A close examination of the Bankruptcy Court's opinion reveals that PPL's first argument is not

without merit.  The Bankruptcy Court explained:

> In computing its damages, PPL selected substitute coal that was available on the spot
> market for the period from June through December of 2002.  The coal PPL selected
> was, however, not the least expensive coal per ton that was available on the spot market
> during these months.  In the normal course of its business, PPL did not necessarily
> purchase coal that sold for the lowest price per ton due to its desire for coal having a
> low sulfur content.  Coal specified in the coal purchase agreement had a relatively low
> sulfur content of 0.9 pounds per million BTU's.  Substitute coal utilized by PPL in its
> first approach to computing its damages had not only a higher price per ton; it also had
> a higher sulfur content.

Document No. 1-9, p. 21.  The opinion contains no discussion of whether PPL's purchases of

replacement coal constituted "commercially reasonable" efforts to effect "cover" within the meaning

of § 2715(a)(2).  It is unclear to the Court whether the Bankruptcy Court had this standard in mind, or

whether it simply chose the calculation methodology advocated by K&J because it disagreed with

certain aspects of PPL's calculation methodology.  Document No. 1-9, pp. 19-30.  The Bankruptcy

20

Court's focus on PPL's failure to use the least expensive coal as the benchmark for computing damages

leads the Court to wonder whether the "commercially reasonable" standard was applied.

The Court is of the view that the governing law permits a nonbreaching party such as PPL to

consider factors other than price, such as the sulfur content of the replacement coal:

> Whether or not the buyer's obligation to mitigate damages has been discharged depends
> on the reasonableness of its conduct. In this connection, reasonable conduct is to be
> determined from all the facts and circumstances of each case, and must be judged in the
> light of one viewing the situation at the time the problem was presented. Where a
> choice has been required between two reasonable courses, the person whose wrong
> forced the choice can not complain that one rather than the other was chosen. The rule
> of mitigation of damages may not be invoked by a contract breaker as a basis for
> hypercritical examination of the conduct of the injured party, or merely for the purpose
> of showing that the injured person might have taken steps which seemed wiser or would
> have been more advantageous to the defaulter. One is not obligated to exalt the interests
> of the defaulter to his own probable detriment.

*In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950) (footnotes omitted). "The requirement

of cover or mitigation of damages is not an absolute, unyielding one, but is subject to the

circumstances." *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 528 (3d Cir. 1978). In the

present case, it is undisputed that K&J breached the Agreement, leaving PPL to find alternative

suppliers of coal. Moreover, it is clear that PPL specifically wanted coal from Dawn Tipple, which was

its prerogative under the Agreement. Document No. 1-9, p. 7. K&J has provided no compelling reason

why PPL was required to settle for coal of lesser quality in order to "cover" the losses caused by the

breach.

PPL argues that the Court should remand this case to the Bankruptcy Court with instructions

to allow its claims in the amount of $1,747,681.40. Document No. 12, p. 8. As noted earlier, however,

this Court cannot make an independent finding of fact in a situation where the Bankruptcy Court has

failed to clearly articulate its findings. Although the Court has not discovered a Pennsylvania case directly addressing the issue, there is considerable authority from other jurisdictions holding that the issue of "commercial reasonableness" within the context of the Uniform Commercial Code presents a question of fact. *Oliver-Mercer Elec. Coop., Inc. v. Davis*, 678 N.W.2d 757, 764 (N.D. 2004); *Riyad Bank v. Gailani*, 61 S.W.3d 353, 356 (Tex. 2001); *Gen Motors Acceptance Corp. v. Johnson*, 746 A.2d 122, 124 (R.I. 2000); *Beshara v. S. Nat'l Bank*, 928 P.2d 280, 286 (Okla. 1996); *Ford Credit Motor Co. v. Mathis*, 660 So.2d 1273, 1276 (Miss. 1995); *First Westside Bank v. For-Med, Inc.*, 529 N.W.2d 66, 68 (Neb. 1995); *Arlington Trust Co. v. Caimi*, 610 N.E.2d 948, 951 (Mass. 1993); *Gen. Elec. Capital Corp. v. Vashi*, 480 N.W.2d 880, 882 (Iowa 1992); *Gaynor v. Union Trust Co.*, 582 A.2d 190, 200 (Conn. 1990); *Rapid City Teachers Fed. Credit Union v. VanTassel*, 464 N.W.2d 206, 208 (S.D. 1990); *First Nat'l Bank v. Ruttle*, 778 P.2d 434, 437 (N.M. 1989); *Lowden Inv. Co. v. Gen. Elec. Credit Co.*, 741 P.2d 806, 808 (Nev. 1987) (applying California law); *Dischner v. United Bank Alaska*, 725 P.2d 488, 489 (Alaska 1986); *First Bank and Trust of Jonesboro v. Vaccari*, 703 S.W.2d 867, 869 (Ark. 1986); *McCoy v. Am. Fid. Bank & Trust Co.*, 715 S.W.2d 228, 230-31 (Ky. 1986); *First Galesburg Nat'l Bank and Trust Co. v. Joannides*, 469 N.E.2d 180, 181 (Ill. 1984); *Kelley v. Commercial Nat'l Bank*, 678 P.2d 620, 625 (Kan. 1984); *Sierra Creek Ranch, Inc. v. J.I. Case*, 634 P.2d 458, 460 (Nev. 1981); *Stephens v. Sheridan Pub. Employees Fed. Credit Union*, 594 P.2d 473, 476 (Wyo. 1979). The Court has no reason to believe that the Supreme Court of Pennsylvania would construe the Uniform Commercial Code, which Pennsylvania has adopted, any differently. Consequently, the question of whether PPL's purchases of replacement coal (and resulting calculations) were within the realm of "commercially reasonable" is a question of fact to be determined by the Bankruptcy Court in the first

instance.

## 2.    Damages for June and July 2002

PPL also argues that the Bankruptcy Court erred in subtracting \$51,915.80 from the damages

calculation to reflect its finding that PPL did not purchase replacement coal in June and July of 2002.

Document No. 12, pp. 4-6.   The Bankruptcy Court determined that PPL provided no "persuasive

evidence" that it had purchased replacement coal on the spot market during those months.  Document

No. 1-9, p. 30. PPL calls the Court's attention to Maas' testimony that replacement coal needed to be

purchased to replace the quantities of coal that were not delivered because of K&J's breach. Document

No. 12, p. 5.  The record, however, also contains evidence suggesting that no such purchases were

made. Stothart testified as follows:

> [Stothart]: The assumption we made in order to make that calculation was that the K&J
> non-delivery had occurred quickly, that we did not know they were not going to deliver
> until June 17th, you know, until essentially they didn't deliver, although I guess in
> fairness you could say June 14th because I spoke with Mr. Thornhill on that day.  At
> that time, at that point of notification, the coal for June had already been ordered and put
> into place.  The schedule of loading the amount of coal we wanted for June had already
> been completed.  Likewise in our process, we make our decisions on spot coal for the
> following month by somewhere around the 10th of the previous month so that by June
> 17th, we had essentially made our decisions on coal to be purchased for July.  So, the
> assumption was made in, when you say in fairness, it was an assumption, that we made
> at the time was that, well, that was done, that was business that was done, let's go
> forward from a point in time when we were able to change, make decisions based upon
> the fact that they did not ship and were not going to ship.
>
> [Counsel]: So, when you done the most recent calculation, in which Mr. Maas is now
> making claims for cover coal for June and July there, in fact, was no cover coal that
> came in for June or July.
>
> [Stothart]: There is not a specific train that I can point to say that was coal that took
> K&J's place.  It is clear that we expected so much coal to come in June, so much coal
> to come in July, to cover our requirements.  That's how we go about our business.  The

23

fact that we didn't get K&J coal for June and didn't get it for July level a hole, it left a hole of two train loads that we had expected that we didn't get. In retrospect, in going through and examining our method with the ability of additional hindsight, we said well, there was a hole that was created, we did have to buy that coal, yes, we ought to include that tonnage, yes. And so we made the decision to put June and July into the calculation.

[Counsel]: Isn't it a fact that in June and July of 2002, that K&J had a fairly—strike that. PPL had a fairly high reserve, a coal stock because it was an easy winter and you were cutting back on your spot purchases so you could draw down your reserve piles?

[Stothart]: I can't recall that with that much specificity as to what our stockpile level was at that time and how that factored into what we were planning to do.

Document No. 7, pp. 37-38. PPL contends that "the Bankruptcy Court misconstrued the evidence presented at trial." Document No. 12, p. 4. Given the lack of specificity in Stothart's testimony, however, the Court cannot conclude that the Bankruptcy Court's determination was devoid of record support. PPL's argument with respect to its spot purchases for the months of June and July is nothing other than an attempt to obtain a different factual determination. *Id.* at 4-5. The Bankruptcy Court's analysis of this issue cannot be characterized as clearly erroneous, since it included a reasonable explanation as to why PPL's calculations were not specific enough to warrant an award of damages for the two months in question. Document No. 1-9, p. 23 ("If, for instance, PPL purchased more coal on the spot market in August of 2002 than it normally would have, PPL did not satisfactorily explain how and why a portion of that excess amount should be treated as cover for the coal debtor did not supply in June and July of 2002."). Therefore, this finding of the Bankruptcy Court will be affirmed.

## IV. CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court is affirmed insofar as it concluded that PPL did not incur additional expenses in specially handling coal from K&J and that PPL

did not purchase replacement coal from the spot market to compensate for K&J's failure to deliver coal during the months of June and July 2002. In so holding, the Court gives "due regard" to the Bankruptcy Court's opportunity to judge the credibility of the witnesses. FED. R. BANKR. P. 8013. With respect to the other two issues raised in the cross-appeals, the factual findings of the Bankruptcy Court are insufficient to sustain the underlying determinations. Consequently, the Bankruptcy Court's decision must be vacated to the extent that it determined that K&J was not entitled to a credit for any price discounts enjoyed by PPL as a result of replacement coal qualifying for the § 29 tax credit and that K&J's method of calculating PPL's damages was the appropriate measure of damages in this case. The case is remanded to the Bankruptcy Court, which must make specific findings as to whether PPL was able to avail itself of discounts because of a § 29 credit applicable to replacement coal and evaluate PPL's actions according to the statutorily mandated standard of commercial reasonableness. Accordingly, the decision of the Bankruptcy Court is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

An appropriate order follows.

25

**AND NOW**, this 5th day of June, 2007, this matter coming before the Court on cross-appeals pursuant to 28 U.S.C. § 158(a), **IT IS HEREBY ORDERED** that the decision of the Bankruptcy Court is affirmed in part and vacated in part, and the case is remanded to the Bankruptcy Court for further proceedings consistent with the accompanying Memorandum Opinion.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

**Cc:    All counsel of record**

26